Number 172066 Robert Gustavsson et al. v. Alcon Laboratories et al. Good morning and may it please the Court. My name is Leah Nichols and I represent the appellants. If I could, I'd like to reserve three minutes for rebuttal. You may. Thank you. The District Court's dismissal of the plaintiffs' claims should be reversed because while the District Court correctly held that the plaintiffs have standing to allege that defendants violated state consumer protection law and caused them monetary harm, here the District Court improperly preemption grounds. First, with regard to standing, this Court should follow the well-reasoned Third Circuit decision in Petrel v. Alcon Laboratories. If this Court has any questions regarding standing, I'm happy to address them. Otherwise, we'll move on to the preemption issue. I'll come back to him at the end, but I'd rather hear about preemption first. Okay, great. Turning to all plaintiffs' claims that are not preempted, there's no disagreement here about the framework governing the preemption issue. If, under the relevant statute, FDA regulations and FDA guidance materials, changes to dropper tips impacting the size of the drops are major changes requiring FDA preapproval, plaintiffs' claims are preempted. If, however, the changes are moderate changes that require manufacturers to notify the FDA of the change via the Changes Being Affected, or CBE, process, plaintiffs' claims are not preempted. Unless defendants can produce clear evidence that the FDA would reject the change, which defendants haven't attempted to do here. Well, what about, one of the rights defined is, this is an example of a major change, which is a change in the drug product containment closure system that controls the drug product delivery to the patient. So, Your Honor, I believe you're referring to its...           B2, small 6. B2, small 6. B2, small 6. B2, small 6. B2, small 6. B2, small 6. B2, small 6.   B2, small 6. B2, small 6. Right, right, so that says, changes to a drug product container closure system that controls a drug product delivered to a patient are changes in the type of composition of packaging components. Just to take the first part of that, it seems that's exactly what you're saying they should have done, is they should have changed the drug product container closure system that controls the drug product delivered to the patient so as to make the drops smaller. Your Honor, no. So we disagree that this is a drug product container closure system that controls the drug product. The FDA... You're talking about the little bottle, right? Yes, that's correct. And you're saying that's not a drug product container closure system that controls the drug product delivered to a patient? That's correct, Your Honor. What else controls the drug product delivered to the patient? It's controlled both... So if I could just go to what the guidance says that that means. And so the 2004 guidance, which was issued on the same day as the regulations, say as       B2, small 6. B2, small 6. B2, small 6. B2, small 6. B2, small 6.  And the answer is B2 because the clinical trial may not have been carried out as a drug  So there is a certain distance that a patient can get away with. The patient can confirm that that happened. You cannot do that with a metered inhaler? No, Your Honor. So, for example, I've got... If you have a metered dose inhaler and you just press it down and keep pressing it, you're still only going to get one dose. And one of the components of sort of getting your FDA approval and so on for a metered dose inhaler is that it gives out that correct amount and you can't influence that at all. If you sort of keep squeezing the bottle, you're going to get more and more is going to come out. And so the... Is this a bottle designed to administer a certain size drop, i.e. a certain dose? Yes. So, it seems very odd that the manufacturer... As I understand it, your claim is that if the dose is too large, it can be harmful to the eye. That's one of the allegations in your complaint. Now, I take it you also agree that if the dose were, say, like one microliter, it wouldn't provide the necessary benefit. So, it's a big deal whether the dose, the size of the drop is the right amount. It can't be too small, it can't be too big. And yet, you want us to hope that the manufacturer can unilaterally change the device that controls the size of the drop without going to the FDA first. That doesn't seem to make common sense. Now, Your Honor, if I could explain why it does. And that's that, you know, as we explain in the complaint, the human eye is only capable of absorbing at a time about 7 microliters. And so, as long as you can get 7 microliters in, it makes sense that the FDA is not particular about whether the drop size, or hasn't been particular about whether the drop size is 15 microliters, or 25 microliters, or 50 microliters. It's harmful because it goes over what you say is the sort of Goldilocks range. We do allege that that does increase the risk of side effects. So, the way that... In the other direction, I think if we ruled in your favor, we'd be saying tomorrow, wouldn't the FDA dispense 2 of the dropper so that it only dispense 2 microliters? And they wouldn't need... Your position is they would not need FDA approval for that. I think that's a different case, and let me explain why. So, the regulation that says what a major change is, and the language mirrors what the statute says, it says that there has to be a substantial adverse effect on the safety or efficacy of the drug. Now, our allegations that changing the size from what it is now, which is between 25 microliters and 50 microliters, to 15 microliters, has no adverse effect and cannot have an adverse effect on the safety and efficacy of the drug. That's what we allege in our complaint, and it's backed by a whole bunch of scientific studies. But that itself seems untrue, because I think the whole reason we have the FDA is because we want the FDA, not you or your expert or me, to make the determination as to what would have an adverse effect on someone's health. And we know the FDA approved a dispenser which dispenses a dropper of a certain size. And we know that if it gets too small, it doesn't provide the beneficial effects of the drug. And yet you're saying the manufacturer can unilaterally decide, I'll make it smaller, it'll still work in my judgment, without securing the judgment of the FDA to that effect. Your Honor, there are two responses to that. One is that we're here to decide whether that's an exclusive decision of the FDA or whether this is something that can be put before a jury. And I'll remind you that in Wyeth itself, in the Supreme Court's decision in Wyeth, it says that in some circumstances, preemption is driven by clear evidence of whether the FDA would or would not approve something. Do you have a second response? I do. And the second response to that is that it's not as if the FDA never sees this change, right? The difference is whether it's preapproval is required or whether they go through the changes being effected process. And so the FDA will get an opportunity to say, you know, to the manufacturer, this is or is not acceptable. The question is just which process do they use. Just so I understand, Your Honor, are you saying if it's a change that would make the drug too small, with all the problems that the word too has in that sentence, but if it makes it too small, it is a major change? I think that's right. So your position is that the right way to read the reds is that it posits a range within which a change can be made. It's not a major change. But it also posits, outside that range, a change to the size is a major change. Yes, and that's the way it's written, yes. So just walk me through how you get there. I take it the predicate for that argument is that the portion of B-2-6, is it B-6? Yes, it's B-2-6. B-2-6. B-2-3 and B-2-6 are the relevant. The portion of the judge guidelines according to you, you have to say that simply does not apply to the drug. Correct. Okay, so that can't be the source of it. Correct. So then, what do we look to that governs the manufacture of a drug? If they make it too small, it's a major change. Well, I think there you're looking at B-1, which is, again, just the general regulation that echoes what's in the statute. And it says if something has a substantial potential here, and I can read the whole thing here, it says it's a major change that has a substantial potential to have an adverse effect on the identity, strength, quality, purity, or potency of the drug product as these factors may relate to the safety or effectiveness of the drug. And so the idea would be that if you make it too small, that has a substantial effect on the strength or potency of the drug? It would have, no, it would have an effect because those are terms of art. It would have an effect on the effectiveness of the drug product, perhaps. But you don't get to the effectiveness. I thought it was the way it reads is it's supposed to have an effect on the potency or strength of the drug. Right. And then how does it finish the text? It says as those factors may relate to safety. As they relate to. Yeah. So the gateway into that, in other words, the way I read it was the reason we care about affecting the strength and potency of the drug is because they may affect the safety or efficacy of it. So on your view, the only thing that could protect against a manufacturer changing to make it too small is if somehow making it too small affects the strength or potency of the drug. But I don't see how that would happen. It doesn't affect the strength or potency of my drug. It just affects the size of the dose of the drug or whatever strength or potency it has. And so then that is a concern. On your reading, it would be permissible for a manufacturer to take it all the way down to a tiny, teeny dropper that gave you no benefit at all. That would be fine and not a major change. That seems very counterintuitive. Well, whether that's true or not, again, it's not as if the FAA doesn't have any say in it. But I'm just trying to get your view. Is your view that a manufacturer is free to change the dropper size to effectively be almost infinitesimal amount that comes out without it being a major change? Because I think the way you're reading it, you're sort of led to having to say that unless somehow the dropper size amount of the dose goes to the strength or potency of the drug. Right. And it doesn't. It doesn't. Right. So your condition really is that the manufacturer can do just what Judge Cadison said, which is make the dropper size however big or however small they want. It's totally up to them. And the FDA has no interest in pre-approving that. You know, Your Honor, if you look at what- Just- Yes. Yes. Yes. Okay. And I'm out of time, so there are no further questions. You may answer Judge Barron's question, please. Right. I mean, I think I was just going to answer and say that if you look at, you know, I think this is borne out in what the FDA has actually done. I mean, the district court took judicial notice of a bunch of FDA actual actions that, you know, have changed the dropper size substantially. And so, you know- No actual inactions. No, because the FDA has in fact- There are some approval letters that relate to the change in the container closure system that approve it under the CBE process. Thank you. Go ahead. Just two things. One, in Wyeth, did the FDA participate in Wyeth? Do we have any views of the FDA in Wyeth beyond the rate itself? Is there any reason not to ask the FDA what it makes of its rates here? No, I don't think there's- You don't have a problem. No, and if you look at, you know, what the FDA has actually done, they treated it as a moderate change. And then secondly, on standing- Yes. The claims that you have of the out-of-state plaintiffs, if you just walk me through the standing as those who don't have a class yet. Correct. There's no way the named plaintiffs in Massachusetts and New York can get relief on those claims. Right, so there's- So there's no person representing those claims. We just have named plaintiffs who are going to seek class certification. So I'm just trying to figure out what do we do with the- What's the standing for those claims? Right, so that's an issue that hasn't been briefed, obviously. We're happy to, if the court would like, we're happy to do supplemental briefing on that question if the court would like. You know, at this point, you know, we're here- But I'm just wondering, if we ruled against you and we said that it's preemptive, I just don't know if there's no standing on those claims. I don't know if that makes a difference for race judicata purposes, whether we decide the case by saying there's no standing on those claims or whether we say our preemption ruling moves out all of the claims. I just am not- But no claim, no class certificate certified. That's correct. So all we have before us are the claims of the named plaintiffs. Correct. If we don't have the claims of them, what is before us in your view? In other words, if we dispose of the case, you clearly have the named plaintiffs' claims. Correct. And let's say we rule against you. Those are dismissed with breaches because of preemption. Is there anything else in the case we have to address then? No, not if you decide it on preemption grounds. So there's, I think- Right, if I understood your question correctly. So if you decide that there's a- Normally, the court would decide the standing question first. But the named plaintiffs have standing. Right. And then we decide that the named plaintiffs' claims are preemptive. Right. Are there any other claims before the court that we have to dispose of in disposing of the case? No. On this appeal? No, not on this appeal. So in effect, all that's at risk, the only thing being appealed here are the named plaintiffs' claims? Right, because we're- because no class has been certified and we're at the motion to dismiss stage. Thank you. Do we have any other questions? Good morning. May it please the court, Greg Osfeld on behalf of the defendants. Your Honor, the essence of the plaintiffs' case is that they believe they have come up with a better design for defendants' FDA-approved prescription eye drops, a design that would involve shrinking the size of the drop delivered to patients by one-half or by two-thirds or even more. Plaintiffs propose to use the federal court's applying state law to command the market to adopt their design. There are two fundamental fatal problems with that approach. First, wanting a more efficient design is not an actionable injury in fact. Second, it is impossible to force the changes that plaintiffs want without seeking FDA's prior approval, and therefore their claims are preempted. Judge Barron, in accordance with your stated preference to my colleague, I'm planning now to start with preemption unless you'd like me to address the threshold issue of standing first. I hope to return to the issue of standing before I reach the end of my argument though. With respect to preemption, I think today is the first time that I've heard plaintiffs' counsel articulate the view that there is some threshold below which this would become a major change, that there is some identifiable point at which point we would shrink our drops unilaterally too small and we could no longer do that unilaterally and we would have to seek the FDA's prior approval. I don't think there's any reasoned basis to make that distinction. And prior to this point, my understanding of the plaintiff's view was that we could shrink the drops unilaterally as low as we want and we could go through the CBE process rather than through a preapproval supplement, which we respectfully disagree with. The reason that I don't think plaintiffs' distinction holds is because the FDA has been crystal clear that the applicant doesn't get to make the decision whether or not a change is a major change or not based on your own assessment. If you just walk me through the text of the provision so I understand where you're locating it. So there's the B-2-6. There's B-2-6. So put that aside for a second because you seem to make an argument that independent of that, it's preemptive. Sure, Your Honor. So how does the text work for you? Well, we're not separating it from the text. I do think the two key provisions here are B-2-romanet-6 and B-2-romanet-3 as well as B-2-romanet-1 because we respectfully disagree with our colleagues' view that strength is not tied in any way to the amount of active ingredient delivered in each dose. We presented the FDA's own view from their glossary that strength is the amount of active ingredient delivered in each dose. Therefore, under B-2-romanet-1, that provision would also apply because you're talking about a major change to the substance that has the substantial potential to affect the strength of the products delivered to the patient by reducing by half or more the amount of active ingredient delivered in each dose to each patient. Now, I think the provision under which that concern is most clearly expressed with respect to the products at issue in this case is subsection B-2-romanet-6, which deals with a change that controls the amount of drug delivered to the patient. And the FDA was pretty clear about what constitutes a container closure system that controls the amount of drug delivered to the patient. I'm reading here from page 2... Before you get to it, just so I understand how these things work together, if your first point is right, B-2-6 is totally unnecessary, right? If my first point is right, you don't have to get to B-2-6 if they are reducing the strength. Would there be any need to include B-2-6 if your first point was right? Your Honor, I do think there would still be a need to include B-2-6 because the FDA's concern was with any change to a container that controls drug delivery. They want to make sure that not too much or too little of a drug product is delivered to the patient. Not only would it have a change to put an infection on the drug, but it would still be a change to the container closure system that dispenses the drugs, hence the FDA might want to itself independently look at that change. Yes, Your Honor. The FDA has several independent concerns here. It has a concern with the strength of the drug delivered to the patient. It has a concern with sterile containers to make sure the sterility of the container is not compromised. And it has a concern with not tinkering with the components, the packaging components of containers that deliver the amount of drug delivered to patients. But I guess in a situation in which B-2-6 is being used when there's no sterility concern, there's no contamination concern, the only concern is the amount of the active ingredient dispensed, there's no reason to look to B-2-6 for that if you're right, because that's already fully taken care of by B-1. Your Honor, I think it could be fully taken care of by B-1. I think the FDA certainly has the ability to express the same concern in different ways and to say that when we're dealing with a container closure system that controls the amount of the drug delivered to the patient, that does raise special concerns like meter dose inhalers. The concern may ultimately be a concern similar to the strength concern because you're tinkering with the amount of drug delivered to the patient. But because we're dealing with a special type of container closure system, the FDA has expressed that concern as a separate and independent concern for these types of containers. And Your Honor, on your point, I think the FDA's comment regarding these container closure systems that control the amount of drug delivered is quite enlightening. The Court first explains what that container closure system is. It says it's a system where the container closure system itself, rather than a person, regulates the amount of drug product that is administered to a patient. Well, Your Honor, that's plain as an entire theory. Many, many allegations of their complaint say that what is controlling the amount of the drug delivered to the patient is the size, diameter, and the size of the orifices and the diameter and the length of the tube before these dropper tips. So that's their theory. I don't have a way to write, though, that a metered-dose inhaler, I can never make it give me more than it's designed to give. Whereas an eye dropper, I can keep squeezing it to get more. That's the distinction she draws. I don't think it's a meaningful distinction, Your Honor. You can keep pushing the metered-dose inhaler as well. You can get as many doses as you want from a metered-dose inhaler. You can get as many drops as you want from an eye dropper. And these droppers are not all the same. Some of them, you tap the bottom, and it dispenses one drop. So you'd have to tap the bottom over and over again, just like you'd have to push the button of a metered-dose inhaler over and over again. The bottom line is, the only thing the patient controls is how many doses you're dispensing, not the amount of drug product that is dispensed. Well, I thought the plaintiff's point was that she can't control the delivery of a smaller amount. She's required to distribute what the dropper permits, but not a smaller amount. And it's the smaller amount which has the effectiveness. I think that is plaintiff's theory, Your Honor, is that she is saying, and this actually feeds quite nicely into the subsection 6 analysis here, she is saying that plaintiffs can't control the amount or the size of the drop dispensed. They have to accept the drop as dispensed. That's why this is a container that controls the amount of the drug delivered, because... And my question to you, though, is that wouldn't the FDA had actually made that determination that for effective delivery, this is the minimal amount that needs to be dispensed? Absolutely, Your Honor. The FDA does assess drop size. That's clear on the face of their complaint. Paragraph 100 of the first amendment complaint makes reference to the FDA's review of drop size. That's why I've never understood their point that the FDA doesn't care about changes to container closure system or doesn't care about drop size. The FDA reviews drop size. Of course it matters to them. And they say in Cognitive 45 that the design and operation of these container closure systems, that's container closure systems that control the amount of product delivered, is critical to ensure that the patient receives the correct dose. A drug product may not be safe or effective if a patient receives too much or too little of the drug product. That's exactly the concern the plaintiffs are raising here. They are proposing to make a change to the drop size that changes the amount of the dose delivered to the patient. And the FDA has clearly stated, drug companies, you don't get to make that determination on your own. You don't get to assess for yourself that that doesn't have a substantial potential adverse effect on the safety or efficacy of the product. You have to come to us. You have to obtain our prior approval. We'll look at your studies. If we agree, we'll let you change the drop size. But you don't get to make that determination on your own. Sure, but what is a pill, a container closure system? A pill is not a container closure system. A pill would be, for a pill, the pill bottle would be the container closure system. That would not be deemed a sterile container and that would not be a container that controls the amount of drug delivered to the patient. What about a preloaded syringe? A preloaded syringe probably would be sterile. I would assume that syringes, I don't have expertise in that area, but I would assume syringes need to be sterile. A syringe probably doesn't control the amount of drug delivered because you don't have, it's not binary. It's not yes, no. It's not you depress the entire syringe or not. There are syringes where you push a button and it dispenses the entire dose. There are implants that periodically dispense drug into the bloodstream. Yes. Would that implant be container closures? A lot of those implants have a lot of patient controls over them. The patient can adjust, like an insulin dispenser, you can adjust the amount of insulin that's dispensed into your body by turning a dial. In that instance, I don't think it would be a situation where the container controls the amount of drug delivered. The patient controls the amount of drug delivered. If it's a single option dispenser, then I think that would be a container that controls the amount of the drug delivered. Could you tell me why a pill does not qualify? A pill can be cut. A pill can be divided. In fact, many times, doctors instruct their patients to divide the pill. So you're reaching into the container, you're drawing out a pill. You can cut it. You can take it whole. You can take two pills. In any event, a container has little or nothing to do with the amount of the drug dispensed other than it holds the pills. It's the human patient that's taking the pills out and is consuming them. I was saying the pill itself contains the drug. Not all of it is the drug. The pill itself contains the drug, and the pill itself could be the dose, depending on the indications on the label. It could be one pill. It could be two pills. But the pill would be the dose. Do you have any concern with us asking the FDA for its view of these drugs? I don't have any concern with that. I would suggest that it may be an unnecessary exercise here because I think the explanatory materials from the preamble to the 2004 final rule is pretty clear about what the FDA's views are on this subject. I don't think you can get much more clear than the language about too much or too little. That said, of course, if the court wanted to ask the FDA for its views, we have no opposition to that. We feel pretty confident in our views. And we think we've interpreted the FDA correctly based on the FDA's own expressed words. On that point, something that didn't come up during counsel's argument but I think looms large in their brief is this issue about the type or composition language contained in the highlights section to the 2004 rule. So I want to briefly touch on that. And the reason I want to is because I really think Plaintiff's Counsel is just misconstruing this language. That language, that section, is titled Highlights of Revisions to the Proposed Rule. And I think it's important to read the section that comes before that, the background section, to understand what's happening here. In 1999, FDA proposed a rule to implement Section 116 of the FDA Modernization Act of 1997. That's the statute that adopted this risk-based framework with major changes, moderate and minor changes. So the FDA proposed a rule in 1999 and it invited notice and comment. It then received 136 comments to which it responded. And it made some revisions to the rule in response to those comments. And it left a lot the same. And after the highlights of the Highlights of Revisions to the Proposed Rule section discusses only what changed. And then after that, you have the much longer series, the much longer section, where the FDA goes through each comment and explains what changed and what didn't change. Now, what changed there was the second clause of Section B, Romanette 6, which dealt with changes in the container closure system affecting the impurity profile of the drug product. That provision, that clause, is not an issue here. And what the FDA did was it clarified that clause, it clarified the wording to make clear that it was only referring to the type or composition of the packaging components that could affect the impurity profile of the drug product. How do you explain the approval letters? Your Honor, with respect to the approval letters, I think they're basically saying the FDA was asleep at the switch. I don't think, I don't know if they're saying the FDA was asleep at the switch. I think what's missing from these real-life examples, aside from missing the point that the FDA has clearly stated that it cares about the amount of the drug dispensed, is that none of these examples deal with the concerns that are at issue here. They're not alleging, nor can they, that any of these examples involve changes to the dimensions of the container closure system to alter the amount of the medication delivered to patients. That's the B-Roman at six concern. That's not raised by any of these examples. But let's say they were. Even if they were, even if these were individual instances where for some reason the FDA decided to allow these changes to go through the CBE process rather than through the pre-approval process. Even if these were instances where the FDA was, as you say, asleep at the switch, these individual actions cannot be construed as a general authorization for the defendants, unilaterally. Could you go back to your factual point? Yeah. You're saying none of these changes involve a change to the container closure system that affected the size of the drop? They're not alleging that any of these changes, nor is there anything in the exhibits to suggest that any of these were changes to the container closure system that affects the size of the drop. What were they? They're saying one of them was a change to the size of the bottle from an eight milliliter to a ten milliliter bottle. They're saying one of them was the approval of a new container closure system and I think the third one was there was a separate new drug application to approve a different type of bottle for a generic product. If it was a new container closure system, why wouldn't it be a change in a drug fire container closure system that controls a drug fire? Your Honor, they're not alleging that the drop tainter in that container changed. It's the drop tainter of the measure that is the component that changes the size of the drop that's dispensed to the patient. They're not alleging that there was any change to the drop tainter or that there was any change to the drop size as a consequence. Regardless, Your Honor, I think what Allentown Max Sales and Encino Motorcars teach on this is that if you're going to change the FDA's official position and here they've pretty clearly stated what their position is, you can't just look to individual actions or look to hidden revisions that might be embedded somehow in individual discrete decisions by the agency and the exercise of its discretion. You have to have an official position with a reasoned explanation. That certainly hasn't happened here. I see that I'm out of time. Just to briefly sum up, we respectfully say I'm sorry, Counselor, Judge Barron has questions about standing. Oh, okay. I just wanted to hear your view and why this is not economic. All right. I mean, just to maybe leave out what I'm thinking, presumably a price gouging statute, are the three standing to challenge it, right? For price gouging? Sure, of course there is. Cool. So the reason there's not economic harm here is because there is a difference between alleging that you paid for something versus alleging that you were injured by the purchase. What the case law teaches is that if you have an illegal pricing behavior by the defendants, that it is a legal expansion of dosing behavior, what's the difference between those two? Your Honor, I think the difference is you've got the teachings of the Rivera, the Rule, and the Schallus cases, all of which indicate that in a functional market, in a freely operating market, which is exactly what is here, they're not alleging that there was any collusive behavior or any gouging type behavior to keep their preferred design off the market. They're not, Your Honor, they're alleging that they wish the products had been designed differently so they could save money. As a comparison, let's say in the Rivera case, that's the Fifth Circuit pain killer case, if in that case the plaintiff had come in and instead of alleging what they did, had alleged that we believe this painkiller could have been better designed to relieve pain for a longer period of time, and by not designing it by our preferred design, you have forced me to buy more painkillers for a        buy more painkillers for a longer period of time. I'm not going to buy more painkillers going to buy more  for a